[No. A069856. First Dist., Div. One. Apr. 22, 1996.]

DOUGLAS F. COPP et al., Plaintiffs and Appellants, v.
KENT F. PAXTON et al., Defendants and Respondents.

## COUNSEL

Charles O. Morgan, Jr., Andrew M. Rosner and Paul Kleven for Plaintiffs and Appellants.

Thomas F. Casey III, County Counsel, and Portor Goltz, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**SWAGER, J.**—This appeal is from a summary judgment dismissing the plaintiffs' complaint for defamation and related tort causes of action. We affirm the judgment.

### FACTS

On February 24, 1994, Douglas F. Copp, and two organizations under his control, The American Rescue Team, and Earthquake Preparedness and Rescue of California (hereafter referred to collectively as Copp), filed a complaint against a county officer, Kent F. Paxton (hereafter Paxton), the

County of San Mateo, and the San Mateo Operational Area Office of Emergency Services (hereafter referred to collectively as County), alleging causes of action for defamation, invasion of privacy by placing plaintiff in a false light, intentional interference with prospective economic advantage, and intentional interference with contract. Paxton and County subsequently moved for summary judgment, relying chiefly on the executive officer privilege of Civil Code section 47, subdivision (a). In a hearing on February 2, 1995, the court granted the motion for summary judgment upon a finding that all the communications "complained of here are absolutely privileged under Civil Code section 47, [subdivision] (a)." Copp appeals from the judgment of dismissal entered pursuant to the order.

Although the extent of his experience is disputed, the record indicates that Copp has a background in demolition work and has participated in an undetermined number of earthquake rescue operations since he first became involved in the rescue effort following the Mexico City earthquake of 1985. Under the auspices of a nonprofit organization, Earthquake Preparedness and Rescue of California, he holds himself out to the public as an expert in earthquake safety and a veteran in earthquake rescue operations. In 1988, he began work on organizing a worldwide conference on disaster mitigation to be held in Puerto Vallarta, Mexico, in September 1993. By the end of 1992, he claims to have "attracted a number of valuable sponsorships as well as the full participation of the governmental authorities in Mexico and the United States consul in Puerto Vallarta." The Hotel Marriott expressed an interest in hosting the conference and Copp was in contact with the operations manager, Dennis Whitelaw, in working out detailed arrangements.

Copp's experience in earthquake rescue convinced him that the conventional advice given to schoolchildren, i.e., to duck under their desks and wait out the earthquake, "was not only wrong, but dangerous, in that it would result in the victim's being crushed" under the desk. He advocates that children should lie down on the floor next to their desk so as to maximize the possibility of finding an open space in the rubble. In January 1992, he distributed a flyer criticizing the "duck and cover" approach, entitled "The Only Way Your Children Can Survive an Earthquake While at School," and prepared a script of a proposed video.

Since 1982, Paxton has served as the area coordinator for the Area Office of Emergency Services in San Mateo County. In this capacity, he is the head of a county department and is appointed by and serves at the will of the county manager. "[H]is official duties include emergency planning, training, public education and response services. His job also involves interacting with other government agencies to coordinate emergency efforts."

In the course of his duties in public education and interagency consultation, Paxton wrote three communications that are the basis of Copp's lawsuit. First, on January 23, 1992, he wrote a memorandum to his staff counseling them to "strenuously rebut" Copp's advice for the earthquake survival of schoolchildren. He states that the memorandum was "in direct response to the inquiry a staff member had received from a Parent-Teachers Association member at the El Granada School. She requested our position on Copp's theory after having received the flyer from Mr. Copp or one of his associates at or near the El Granada Elementary School."

Secondly, on February 20, 1992, he wrote a four-page letter to Rich Eisner, executive director of the Bay Area Regional Earthquake Preparedness Project, describing an encounter with Copp. As part of his official duties, Paxton attends meetings of public committees devoted to disaster preparedness. Earlier that day, he had attended a meeting of the Coastside Emergency Services Council, composed of a small group of local officials from coastal San Mateo County employed in the field of public safety, emergency services, hospital administration and school administration. At the request of a representative from the El Granada Elementary School, Copp had been invited to present his views. Paxton recounted that he interrupted Copp's presentation after about 10 minutes to challenge his personal knowledge of the Mexico City earthquake and credentials in earthquake rescue operations. After the presentation, Paxton responded with a defense of the conventional advice of getting under a desk in an earthquake.

Thirdly, on January 21, 1993, he wrote a letter to a private citizen, Warren Johnson, questioning Copp's credentials and referring him to three officials who could "debunk Copp's assertions." Johnson had contacted Paxton at the suggestion of Dan Eberle of the San Diego Office of Disaster Preparedness. Describing himself as president of the Naval League of Minnesota, Johnson called from a local telephone and asked Eberle if he knew a Douglas Copp. He explained that "he was calling because he had a friend in Puerto Vallarta who managed a hotel or something down there, and that this Douglas Copp was involved in a conference down there, and he had some concerns of some of the things that [were] being said." Eberle referred Johnson to Paxton because he had learned of Paxton's staff memorandum through a colleague on a state committee. Paxton recounted that he talked for about five minutes with Johnson and promised to send him further information. Apparently lacking an address, Paxton sent the letter to Johnson care of Eberle in San Diego.

In some manner, the two letters and staff memorandum reached the sponsors of the conference that Copp was promoting in Puerto Vallarta. The

letter to Johnson mentions only the enclosure of photographs. When asked if he also enclosed the Eisner letter, Paxton professed not to remember: "Q. What is it that you sent to him? A. I sent him a letter and some pictures of school earthquake damage. And I'm not sure whether or not I sent him a copy of the summary of our meeting that I had written to Richard Eisner a year earlier, 11 months earlier. Q. Why is it you're not sure whether you sent that or not? A. I simply don't recall." Paxton did not offer, however, any other explanation as to how the staff memorandum and confidential letter to a colleague could have reached the conference sponsors. He testified that he received only one other inquiry related to the conference—from the conference coordinator, Elizabeth Estrada, who was working with Copp. He talked to her twice by telephone "in the February/March '93 time frame." In her second call, she said that his letter or letters to Johnson were being circulated among sponsors in Mexico. Paxton did not remember whether she referred to one or more letters.

According to Copp's declaration, the attitude of the conference sponsors abruptly changed around the end of January 1993. "From full support, the sponsors suddenly withdrew all support, without explanation. Finally, Dennis Whitelaw of the Marriott provided me with the packet of documents . . . which had been circulating among the sponsors." The documents included the three communications from Paxton. Though Copp tried to revive interest in the conference, it was ultimately canceled. As a consequence, Copp complains that he lost "over $100,000 in promised or anticipated fees."

## DISCUSSION

### A. Were the Communications Defamatory?

■ In this appeal, we refrain from weighing the evidence but inquire only whether there are any triable issues of fact. (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) " 'The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.' [Citation.] 'The affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion.' " (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134].)

■ The appeal presents the threshold question of which statements, if any, in the three communications—the staff memorandum, the Eisner letter

and the Johnson letter—are actionable. We begin with the statutory definition of libel in Civil Code section 45: "Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, . . . or which has a tendency to injure him in his occupation."

Some of Paxton's statements which Copp finds injurious fall into the category of opinions. Despite the broad statutory language, such opinions are not actionable as a matter of constitutional law. ▇ "An essential element of libel . . . is that the publication in question must contain a false statement of *fact*. . . . This requirement . . . is constitutionally based." (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600-601 [131 Cal.Rptr. 641, 552 P.2d 425].) "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997], fn. omitted.) A statement of opinion, however, may still be actionable "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." (*Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 451-452 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1 [111 L.Ed.2d 1, 110 S.Ct. 2695]; Rest.2d Torts, § 566, p. 170.) "The dispositive question for the court is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion. . . ." (*Moyer* v. *Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724 [275 Cal.Rptr. 494], citation and fn. omitted; *Kahn* v. *Bower* (1991) 232 Cal.App.3d 1599, 1607 [284 Cal.Rptr. 244].)

The issue whether a communication was a statement of fact or opinion "is a question of law to be decided by the court." (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) In making the distinction, the courts have regarded as opinion any "broad, unfocused and wholly subjective comment," (*Fletcher* v. *San Jose Mercury News* (1989) 216 Cal.App.3d 172, 191 [264 Cal.Rptr. 699]) such as that the plaintiff was a "shady practitioner" (*Lewis* v. *Time Inc.* (9th Cir. 1983) 710 F.2d 549, 554),"crook" (*Lauderback* v. *American Broadcasting Companies* (8th Cir. 1984) 741 F.2d 193, 195-198), or "crooked politician" (*Fletcher* v. *San Jose Mercury News, supra*, 216 Cal.App.3d at pp. 190-191). Similarly, in *Moyer* v. *Amador Valley J. Union High School Dist., supra*, 225 Cal.App.3d at page 725, this court found no cause of action for statements in a high school newspaper that the plaintiff was "the worst teacher at FHS" and "a babbler." The former was clearly "an expression of subjective judgment." (*Ibid.*) And the epithet "babbler" could be reasonably understood only "as a

form of exaggerated expression conveying the student-speaker's disapproval of plaintiff's teaching or speaking style." (*Id.* at p. 726.)

 Under these principles, we may easily dismiss as nonactionable several bluntly expressed opinions in the documents, such as the statement that Copp's views were "nonsense." We have given close attention, however, to three inimical statements in the Eisner letter. The letter begins by questioning Copp's reliability for truthfulness: "I was invited to keep him honest. Quite an experience. Quite a challenge." It later refers to him as a "booby." And alluding to his residence in Half Moon Bay, it ends with the comment: "I think our best approach is to leave him baying in the ocean breezes." While these statements may fall within the statutory language of Civil Code section 45, they are still constitutionally protected speech. The expression "keep him honest" makes no factual imputation of specific dishonest conduct capable of being proved true or false. The epithet "booby," like the expression "babbler," can be understood only as a vague expression of low esteem. And the allusion to "baying in the ocean breezes" is a metaphoric and subjective expression of disapproval, devoid of any factual content.

We similarly find no support for Copp's contention that Paxton made defamatory misstatements of fact. The plaintiffs' separate statement in opposition to the motion for summary judgment disputes the factual accuracy of Paxton's letters and memorandum in three respects: (1) Copp's views on earthquake survival "are shared by other rescue experts who possess substantial international experience and renown," (2) Copp is "a bona fide rescue expert" with "formal training and practical on-site experience," and (3) "Paxton lacked reasonable grounds for believing" that his statements were true.

The first two claims are directed at statements in Paxton's letter to Johnson. In support of the first claim, Copp has produced declarations from two individuals in an English disaster relief organization which support Copp's opinions, but do not contradict the actual statement that Paxton made in the Johnson letter. In cautious language, Paxton stated, "All emergency preparedness agencies I know of, including the Federal Emergency Management Agency, Emergency Planning Canada, and the California Office of Emergency Services, recommend that children take shelter under desks when earthquakes strike." With respect to the second claim, Copp adduces evidence that he in fact has formal training and practical experience qualifying him as an earthquake rescue expert, but again he does not contradict Paxton's carefully worded statement: "My impression is that [Copp] has some former experience in the construction industry, and has been to several

earthquakes around the world. He has not been able to demonstrate to me any prior formal training in emergency rescue."

In support of the claim that Paxton made knowingly false statements, Copp raises two minor factual issues. First, he takes exception to Paxton's statement in the Johnson letter that Richard Eisner "is familiar with Copp's . . . attempts to support himself through 'rescue training' classes." Secondly, he takes aim at a statement in the Eisner letter regarding earthquake damage in Mexico City schools. In his account of the Coastside Disaster Council meeting, Paxton recalled, "I said I had never heard of any such loss [in Mexico City schools], that the earthquake occurred at 7:18 am when schools were empty." Nevertheless, while these statements may have been erroneous,[1] they were not defamatory. Neither statement concerned a matter having a tendency to expose Copp to "hatred, contempt, ridicule, or obloquy" or injury "in his occupation" within the meaning of Civil Code section 45.

Our analysis reveals only one statement in the three communications that could be considered actionable. The staff memorandum concludes, "Sermon over. As Doug Copp says, let us prey . . . ." The statement, of course, is not intended to be understood as an actual quotation of Copp's words but rather facetiously imputes the words to him as a way of conveying the opinion that he exploits the fears of parents for personal gain. An opinion of this kind can imply the existence of undisclosed facts as the basis for the opinion. (*Baker v. Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 266.) Since the implied facts may reasonably be regarded as defamatory under Civil Code section 45, the statement could constitute actionable speech.

B. *The Executive Officer Privilege of Civil Code Section 47, Subdivision (a).*

 We turn now to the application of the executive officer privilege of Civil Code section 47, subdivision (a). Enacted in 1872, the statute states simply: "A privileged publication or broadcast is one made: (a) In the proper discharge of an official duty." The annotation to the section made by the Code Commission in 1872 indicated that it was intended "as a codification of the general principles developed by the courts." (*Saroyan v. Burkett* (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293].) At the time of its enactment, the legal authorities cited by the Code Commission recognized

---

[1]At his deposition, Eisner said he had never heard of Copp's efforts to support himself with classes of this sort and Copp declares that he has voluntarily donated his efforts in the field of earthquake rescue. With respect to the Mexico City earthquake, Copp shows that there were in fact casualties in schools that began classes at 7 a.m. and that Paxton sent Eisner an annotated photograph of such a school.

an absolute privilege only in judicial and legislative proceedings. Twenty years later, the United States Supreme Court applied the privilege to the executive branch of government, holding a communication of the Postmaster General to be absolutely privileged. (*Spalding* v. *Vilas* (1896) 161 U.S. 483 [40 L.Ed. 780, 16 S.Ct. 631].)

Following federal authority, the California Supreme Court first applied the privilege to the executive branch in *Saroyan* v. *Burkett, supra*, 57 Cal.2d 706. An attorney sued his former employer, the Superintendent of Banks, alleging that he was defamed by a press release relating to his conduct as attorney for the State Banking Department. After reviewing the *Spalding* decision and other authority extending the privilege to "federal and state officials of high rank," the court held: "We are in accord with the rule granting an absolute privilege to state officials corresponding in rank to federal cabinet members. Defendant [Superintendent of Banks] was such an official. . . . [He] was acting in the exercise of an executive function when he defended the policy of his department, and his statements were related to the defense of that policy. Accordingly defendant was protected by an absolute privilege." (*Saroyan* v. *Burkett, supra*, at pp. 710-711.)

In *Kilgore* v. *Younger* (1982) 30 Cal.3d 770 [180 Cal.Rptr. 657, 640 P.2d 793], the California Supreme Court similarly extended an absolute privilege to the Attorney General, who was sued for defamation and other tort causes of action after releasing a report on organized crime naming the plaintiff as a person suspected of criminal activity. The court noted, "The absolute privilege is extended to 'high-ranking state and federal officials, such as the President of the United States, the governor of any state or territory, cabinet officers of the United States and the corresponding officers of any state or territory' [citation] on the rationale that their ability to function would be impaired and society adversely affected if they were not absolutely free of the threat of suit by the defamed seeking recompense for injury. . . . For the absolute privilege to attach, the public official need only be properly discharging an official duty." (*Id.* at p. 778.) In issuing the report, the court found that the Attorney General was "discharging an 'official duty' " (*id.* at p. 779) related to his "policy making functions." (*Id.* at p. 781.)

Some later authority limits the privilege to state officials of cabinet rank. In *Frisk* v. *Merrihew* (1974) 42 Cal.App.3d 319, 323 [116 Cal.Rptr. 781, 85 A.L.R.3d 1128] the court denied immunity to a school superintendent and secretary of the school board by holding: "A school superintendent or secretary of a school board is clearly outside the above-defined cabinet level state officials." We find, however, that the weight of authority follows federal precedents in extending the privilege to lower ranking officials.

The leading decision, *Barr* v. *Matteo* (1959) 360 U.S. 564 [3 L.Ed.2d 1434, 79 S.Ct. 1335], which has been repeatedly cited in California case law, extended the privilege to the Acting Director of the Office of Rent Stabilization—an office well below cabinet rank. The director was sued for issuing an allegedly defamatory press release in which he responded to Congressional charges of malfeasance by suspending the plaintiffs from duty for improperly authorizing certain employee benefits. Noting that the federal privilege "has in large part been of judicial making," (360 U.S. at p. 569 [3 L.Ed.2d at p. 1440]), the court quoted at length from a decision of Judge Learned Hand providing an "admirably expressed" rationale for the rule. In Hand's words, the justification for extending the privilege " 'is that it is impossible to know whether the claim [for defamation] is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .' " (*Id.* at pp. 571-572 [3 L.Ed.2d at p. 1441], citation omitted.)

Since the executive privilege is "an expression of a policy designed to aid in the effective functioning of government," the court reasoned in *Barr* that it should be extended to lower officials to the extent necessary to carry out that policy. (*Barr* v. *Matteo, supra,* 360 U.S. at pp. 572-573 [3 L.Ed.2d at p. 1442].) "It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted . . . which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits." (*Id.* at pp. 573-574 [3 L.Ed.2d at pp. 1442-1443], citation omitted.) Under this standard, the privilege was available to the Director of the Office of Rent Stabilization. "We think that under these circumstances a publicly expressed statement of the position of the agency head, announcing personnel action which he planned to take in reference to the charges so widely disseminated to the public, was an appropriate exercise of the discretion which an officer of that rank must possess if the public

service is to function effectively." (*Id.* at pp. 574-575 [3 L.Ed.2d at p. 1443].)

Three later California decisions pose the question whether the privilege should be extended to lower ranking officials without resolving it in terms applicable to the present case. In *White* v. *State of California* (1971) 17 Cal.App.3d 621 [95 Cal.Rptr. 175], the court considered whether the privilege applied to employees of the Bureau of Criminal Identification and Investigation who negligently posted erroneous information on plaintiff's criminal record. While recognizing out-of-state authority for extending the privilege to officials below cabinet rank, the court found "no indication in *Saroyan* that absolute privilege is to be extended to executives of lesser rank." (*Id.* at p. 628.)

In *Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406 [134 Cal.Rptr. 402, 556 P.2d 764], the city clerk, who erroneously released certain funds, sought to avoid personal blame by telling a reporter that plaintiff had carried out "a real con job." (*Id.* at p. 410.) The court recognized the policy justification for extending the privilege to policymaking officials below cabinet rank, but held that the clerk was not exercising "policy-making functions" in his statements to the reporter: "[T]he purpose of the so-called absolute 'official duty' privilege is to insure efficiency in government by encouraging *policy-making* officials to exercise their best judgment in the performance of their duties free from fear of general tort liability. [Citation.] . . . [The city clerk] was not exercising policy-making functions when he defamed plaintiff, and thus he is not protected by the absolute privilege contained in Civil Code section 47, subdivision 1. [(Now subd. (a).)]" (*Id.* at p. 413.)

In *Neary* v. *Regents of University of California* (1986) 185 Cal.App.3d 1136 [230 Cal.Rptr. 281], the court reached a similar conclusion. The vice chancellor of the University of California at Davis released an allegedly defamatory report on the ground that it was "subject to public disclosure under the Public Records Act." (*Id.* at p. 1142.) The court conceded that the executive privilege might be properly extended to the defendant: "[His] position as vice chancellor at the university does not place him at the highest levels of state government. The university, however, is a constitutional department of state government. [Citations.] Its regents possess such general rule and policymaking powers as are necessary to control the university's operation. [Citation.] To the extent, however, that [defendant] is the agent of the regents . . . , he may indeed fall into the category of a state official who engages in policymaking. [Citation.]" (*Ibid.*) The court held, however, that the release of the report was a ministerial act outside the privilege conferred by Civil Code section 47, subdivision (a).

Only one decision, *Royer* v. *Steinberg* (1979) 90 Cal.App.3d 490 [153 Cal.Rptr. 499], has extended the privilege to a county official; but, in light of the legal background we have reviewed, it can be viewed as being consistent with the mainstream of authority. By a majority vote, three trustees of a school board passed an allegedly defamatory motion charging the plaintiff, a former superintendent of schools, with improper election activities. When the plaintiff sued the three trustees, the court held that the motion fell within the executive privilege. Noting the language in the *Sanborn* decision, the court held: "The clear import of this language is that the policy of protecting the free exercise of governmental decision-making mandates that the privilege of [Civil Code] section 47, subdivision 1 must be granted not only to 'high-level' state executive officers, but also to all state and local officials who engage in the policy-making process. We therefore hold that the privilege of [Civil Code] section 47, subdivision 1 protects any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his official duties." (*Id.* at p. 501.) The motion, the court found, was "within the scope of [the trustee's] official duties" and therefore was absolutely privileged under Civil Code section 47, subdivision (a). (*Royer* v. *Steinberg, supra,* 90 Cal.App.3d at p. 501.)

Under these precedents, we hold that the executive privilege of Civil Code section 47, subdivision (a), may extend to a county official of Paxton's rank. As the trial court observed, "Who is higher than Mr. Paxton in his world? In this County? Isn't he the captain of the ship, even though, perhaps it's a destroyer rather than a battleship?" The policy underlying the privilege applies fully to a county executive entrusted with the vital public function of Paxton's office. Earthquake safety and procedures in an urban area through which a great fault runs is of vital public concern. It is especially important as it relates to schools. We need only look back a few years to see how a significant earthquake can affect the community and its infrastructure. Public officials in Paxton's capacity should be encouraged to engage in frank and open communication on important public issues in order to function effectively in the offices entrusted to them. The public benefit of such communications outweighs the potential harm to any individual's reputation.

The privilege, however, does not apply to all acts of a qualifying executive officer. The *Royer* decision states that the privilege applies only to communications made "while exercising policy-making functions." (*Royer* v. *Steinberg, supra,* 90 Cal.App.3d at p. 501.) Similar language is found in *Sanborn* v. *Chronicle Pub. Co., supra,* 18 Cal.3d at page 413, *Kilgore* v. *Younger, supra,* 30 Cal.3d at page 781, and *Neary* v. *Regents of University of California, supra,* 185 Cal.App.3d at page 1143. The *Saroyan* decision, however, speaks more broadly of acts "in the exercise of an executive

function . . . ." (*Saroyan* v. *Burkett, supra,* 57 Cal.2d at p. 710.) This formulation better reflects the standard in *Barr* v. *Matteo, supra,* 360 U.S. 564 which asks whether the communication "was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." (*Id.* at p. 575 [3 L.Ed.2d at p. 1443].) It is not necessarily inconsistent with language referring to the "exercise of policy-making functions" but calls for a broad interpretation of this language to encompass all discretionary acts essential to the proper exercise of an executive function. We regard the language of the *Saroyan* decision as best defining the parameters of the privilege.

Under this standard, we find that the initial publication of the staff memorandum was absolutely privileged under Civil Code section 47, subdivision (a). Paxton's duty to promote public education on earthquake safety embraced giving guidelines to his staff on how to respond to advocates of novel earthquake survival strategies. Our holding is consistent with other decisions denying the privilege to lower ranking officials. In *White* v. *State of California, supra,* 17 Cal.App.3d 621, the defendant employees performed a ministerial function at a level far below that of Paxton's office. In *Sanborn* v. *Chronicle Pub. Co., supra,* 18 Cal.3d 406 and *Neary* v. *Regents of University of California, supra,* 185 Cal.App.3d 1136, the allegedly defamatory acts did not relate to the exercise of an executive function.

Copp contends, however, that the staff memorandum was republished by enclosing it with the Johnson letter. Though the evidence is largely circumstantial, we think that it is sufficient to support an inference that such a republication took place. There is no other explanation of how the document could have reached the Mexican sponsors of the conference. Paxton did not engage in other correspondence which could have served as a conduit for the document. And the fact that the document was circulated shortly after Paxton wrote the Johnson letter tends to enhance the likelihood that he in fact released it to Johnson. Paxton's own equivocal testimony lends a degree of support to this inference.

We therefore must consider whether the republication of the staff memorandum comes within the privilege of Civil Code section 47, subdivision (a). While it may have been part of Paxton's job to answer private inquiries, we do not think it pertained to the exercise of an executive function. It was rather the sort of routine, ministerial task which might have been performed by any member of his staff and therefore falls outside the scope of the privilege.

C. *Limited Purpose Public Figure.*

Our analysis has reduced the case to one defamatory statement—the last sentence in the staff memorandum—and one possible publication outside the

absolute privilege of Civil Code section 47, subdivision (a)—the alleged enclosure of the staff memorandum with the Johnson letter. Paxton maintains that this republication of the staff memorandum, if it occurred, is still entitled to a qualified privilege requiring Copp to prove actual malice by clear and convincing evidence. We agree.

■ In the landmark decisions, *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 296 [11 L.Ed.2d 686, 717-718, 84 S.Ct. 710, 95 A.L.R.2d 1412] and *Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. 323, the United States Supreme Court held that public figures must prove by clear and convincing evidence that an allegedly defamatory statement was made with knowledge of its falsity or in reckless disregard of its truth or falsity. The rationale for imposing this burden on a public figure in an action for defamation lies in large measure in the "consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.' [Citations.]" (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 253 [208 Cal.Rptr. 137, 690 P.2d 610].) The question whether a plaintiff was a public figure "is a question to be determined by the court, rather than the jury." (*Denney* v. *Lawrence* (1994) 22 Cal.App.4th 927, 933 [27 Cal.Rptr.2d 556].)

In the *Gertz* decision, the court observed that the characterization of a plaintiff as a public figure "may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." (*Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) ■ To characterize a plaintiff as a limited purpose public figure, the courts must first find that there was a public controversy. In a much cited analysis, *Waldbaum* v. *Fairchild Publications, Inc.* (D.C. Cir. 1980) 627 F.2d 1287, 1297 [201 App.D.C. 301], concludes that "[i]f the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." The courts must next determine that the plaintiff undertook "some *voluntary* act through which he seeks to influence the resolution of the public issues involved." (*Reader's Digest Assn.* v. *Superior Court, supra*, 37 Cal.3d at p. 254, fn. omitted.) The ". . . courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves into the forefront of particular public controversies." (*Id.* at pp. 254-255.) It is not necessary to show that a plaintiff actually achieves prominence in the public debate; it is sufficient that "[a plaintiff] attempts to thrust himself into the

public eye" (*Rudnick* v. *McMillan* (1994) 25 Cal.App.4th 1183, 1190 [31 Cal.Rptr.2d 193]) or to influence a public decision. (*Okun* v. *Superior Court, supra,* 29 Cal.3d at p. 451.) "Finally, the alleged defamation must have been germane to the plaintiff's participation in the controversy." (*Waldbaum* v. *Fairchild Publications, Inc., supra,* 627 F.2d at p. 1298.) Where the issue turns on expert or specialized knowledge, the plaintiff's own credentials assume such relevance to the controversy. (*Ibid.*)

 Under this standard, we find as a matter of law that Copp was a limited purpose public figure. The issue of earthquake disaster mitigation in public schools had "foreseeable and substantial ramifications for nonparticipants" (*Waldbaum* v. *Fairchild Publications, Inc., supra,* 627 F.2d at p. 1297) and must have generated sufficient public concern to lead to legislation. (Ed. Code, § 35297.) Copp had made some limited local efforts to inject himself into this public debate by passing out flyers and the script of his video and by speaking at the Coastside Emergency Services Council. More significantly, he was attempting to thrust himself into the forefront of the debate by organizing a worldwide conference on disaster mitigation which had the potential of providing him with a forum for promoting his views at the center of public debate. Lastly, since the matter of earthquake survival in schools was a matter peculiarly within the knowledge of rescuers and other experts, Copp's own experience and credentials were germane to the public controversy. The public needed to know whether there was reason "to listen to him." (*Waldbaum* v. *Fairchild Publications, Inc., supra,* 627 F.2d at p. 1298.)

As a limited purpose public figure, Copp has the burden of proving by clear and convincing evidence that Paxton enclosed the defamatory staff memorandum with the Johnson letter with knowledge of its falsity or with reckless disregard of its truth or falsity. We find no evidence in the record from which the trier of fact could reasonably find Paxton's actual knowledge of the statement's falsity. It is a close question, however, whether the evidence is sufficient to sustain Copp's burden of proving reckless disregard for truth or falsity.

 The burden of proof by clear and convincing evidence "requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208 [200 Cal.Rptr. 115]; com. to BAJI No. 2.62 (8th ed. 1994 bound vol.) p. 56.)

In *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323], the United States Supreme Court sought to clarify the

constitutional standard of reckless disregard for truth or falsity: "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." Although the issue turns on the subjective good faith of the defendant, the plaintiff may attempt to prove reckless disregard for truth by circumstantial evidence, "A failure to investigate [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations] —such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 258, fn. omitted.)

██ Though Copp maintains that Paxton was engaged in a campaign to discredit him, the evidence in support of this contention is very meager. Paxton attempted to rebut Copp at a public meeting, and wrote a memorandum to staff and a letter to a colleague. A year later he responded to a private inquiry. In each case, he acted in discharge of his duties as a public official—whether executive or ministerial in nature. It may be true that Paxton relied on intuitive judgment with little actual investigation or evidence in characterizing Copp as a self-styled expert in pursuit of personal gain, but we find no compelling reason to believe that he acted in bad faith. Copp's credentials were not beyond question and, as alleged in the complaint, he did in fact hope to earn $100,000 in fees by sponsoring an international conference.

Moreover, while the trier of fact could reasonably infer that the staff memorandum was probably enclosed with the Johnson letter, it is by no means certain that it reached the conference sponsors by this route and, if it did, the actual circumstances surrounding the enclosure of the document are obscure. Paxton gave no direct testimony on the point. The staff memorandum could have been inserted by a staff assistant or enclosed by Paxton without reflection or as a hurried afterthought. The memorandum did contain useful information and insights. Paxton may well have enclosed it solely for its informational value, overlooking the nature of the sentence he had written 11 months earlier.

Though the record may support an inference that Paxton enclosed the staff memorandum with the Johnson letter, it only provides a basis for speculation that he entertained a serious doubt as to the truth of the concluding sentence. Such a speculative possibility falls short of clear and convincing evidence.

We do not think that the finder of fact could reasonably infer a high probability, sufficient to command unhesitating assent, that Paxton acted with reckless disregard for the truth or falsity of the statement. (See *Nadel* v. *Regents of University of California* (1994) 28 Cal.App.4th 1251, 1270 [34 Cal.Rptr.2d 188]; *Reader's Digest Assn.* v. *Superior Court*, supra, 37 Cal.3d at p. 256.)

D. *Related Tort Causes of Action.*

■ Although the appeal has centered on the cause of action for defamation, the complaint also alleges causes of action for invasion of privacy by placing plaintiff in a "false light," interference with prospective economic advantage and interference with contract. It is now established that claims for invasion of privacy (*Reader's Digest Assn.* v. *Superior Court*, supra, 37 Cal.3d at p. 265) and interference with prospective economic advantage (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1045 [232 Cal.Rptr. 542, 728 P.2d 1177]; *Hofmann Co.* v. *E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 401-408 [248 Cal.Rptr. 384]) may not be based on speech that is entitled to constitutional protection. Moreover, the statutory restrictions on a cause of action for defamation apply to an alternative theory of invasion of privacy based on the same facts. (*Fellows* v. *National Enquirer, Inc.* (1986) 42 Cal.3d 234, 240 [228 Cal.Rptr. 215, 721 P.2d 97, 57 A.L.R.4th 223].) We recognize that causes of action for interference with contract and prospective economic advantage, which broadly impose liability for intentional conduct designed to interfere with contractual and economic relationships, are not necessarily linked with the same facts that support a claim of defamation. In the present case, however, these alternative theories are based on precisely the same communications which we have found to be statutorily and constitutionally protected and are therefore barred on the same grounds.

The judgment is affirmed.

Strankman, P. J., and Dossee, J., concurred.

A petition for a rehearing was denied May 21, 1996, and appellants' petition for review by the Supreme Court was denied August 14, 1996.