Filed 1/11/21  Burgess v. Coronado Unified School Dist. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| RANDALL BURGESS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CORONADO UNIFIED SCHOOL DISTRICT,<br><br>    Defendant and Respondent. | D076417<br><br>(Super. Ct. No. 37-2018-00046135-CU-DF-CTL)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the disposition paragraph on page 18 of the opinion filed December 24, 2020, be modified as follows:

> The order granting the District's anti-SLAPP motion is affirmed.  The District is entitled to recover its appellate costs, including any attorney's fees properly recoverable under the anti-SLAPP statute. (See Code Civ. Proc., § 425.16, subd. (c)(1); *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1426.)

Appellant's petition for rehearing is denied.

There is no change in judgment.

O'ROURKE, Acting P. J.

Copies to:  All parties

Filed 12/24/20  Burgess v. Coronado Unified School Dist. CA4/1 (unmodified opinion)
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| RANDALL BURGESS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CORONADO UNIFIED SCHOOL DISTRICT,<br><br>Defendant and Respondent. | D076417<br><br><br><br>(Super. Ct. No. 37-2018-00046135-CU-DF-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

herronlaw and Matthew V. Herron for Plaintiff and Appellant.

Winet Patrick Gayer Creighton & Hanes, Randall L. Winet and David A. Veljovich for Defendant and Respondent.


High school teacher and coach Randall Burgess was placed on administrative leave following a student's allegations of molestation. Responding to local media inquiries, the superintendent of the Coronado Unified School District (District) issued a press release stating that after "the allegations became known, the District followed policy and protocol by taking

immediate action to protect the safety and security of District students and staff." Burgess sued the District for libel, claiming its press release implied he was *credibly* accused of child molestation. The trial court granted the District's special motion to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP statute), concluding Burgess could not establish a probability of prevailing on his libel claim. In the court's view, the District's five-sentence press release contained no false statements of fact and was, moreover, absolutely privileged under the official duty privilege in Civil Code section 47, subdivision (a).[1] Burgess appeals, challenging both aspects of the court's ruling. For our purposes, we need only focus on one. Because we agree that the official duty privilege under section 47, subdivision (a) applies, Burgess could not establish a probability of prevailing on his libel claim even if the press release could be construed as defamatory. Accordingly, we affirm the order granting the District's anti-SLAPP motion.

FACTUAL AND PROCEDURAL BACKGROUND

Burgess, a long-time teacher and water polo coach at Coronado High School, was placed on paid administrative leave in April 2017 after a student claimed that Burgess had molested him several years before when he was a middle schooler. Without revealing the reason for his placement on leave, Burgess filed a petition for writ of administrative mandate against the District in June seeking reinstatement (*Burgess v. Coronado Unified School District* (Super. Ct. San Diego County, 2017, No. 37-2017-00022539-CU-WM-CTL)).

A month later, having become aware of Burgess's writ petition, a reporter for the San Diego Reader contacted District superintendent Karl

---

[1]    Unless otherwise indicated, further statutory references are to the Civil Code.

Mueller for comment, noting Burgess had alleged "that he is now banned from entering the school as well as the pool where he coached" and asking to know what prompted those restrictions. Mueller responded that he could not discuss personnel matters. The Reader published a story in September, relying on court filings to reveal the molestation claim as well as the District's response. This prompted three other news outlets to contact Mueller for comment. Mueller then responded by issuing the following press release on September 20, 2017:

> "The collective focus and priority of the Coronado Unified School District is teaching and learning while nurturing a safe and supportive environment for those within our shared community. Allegations have been made against a Coronado Unified School District staff member. The District takes such claims very seriously. When the allegations became known, the District followed policy and protocol by taking immediate action to protect the safety and security of District students and staff. [¶]

> "As this is a personnel related issue, the District has no further comment."

In October 2017, Judge Sturgeon denied Burgess's request for writ relief, finding he had not been suspended but rather placed on administrative leave. Burgess appealed. In the meantime, he was reinstated in November after the alleged victim did not bring a claim within the six-month filing window (Gov. Code, § 945.6). Reinstatement ultimately rendered his appeal moot. (*Burgess v. Coronado Unified School District* (Oct. 1, 2018, D072976) [nonpub. opn.].)

In September 2018, Burgess sued the District for libel per se based on the press release issued by Mueller a year before.[2] Alleging the District had implied he "was guilty of, or at least credibly charged with, being a child molester and therefore needed to be removed from the classroom to protect students," Burgess claimed the release exposed him to "hatred, contempt, and ridicule," injuring his professional reputation.

The District filed a special motion to strike under the anti-SLAPP statute (Code Civ. Proc, § 425.16). It was undisputed the libel action arose from the District's protected speech. With the burden shifted, the District asserted that Burgess could not establish a probability of prevailing on the merits. According to the District, the press release did not contain any false or defamatory statements of fact. It also relied on *Morrow v. Los Angeles Unified School District* (2007) 149 Cal.App.4th 1424 (*Morrow*) to assert that the statements in the release were absolutely privileged under section 47, subdivision (a).

Burgess opposed the District's motion. Because the press release was made by a mere "local school employee" and contravened District confidentiality policy, he claimed the official duty privilege under section 47, subdivision (a) did not apply. Moreover, he argued that the press release would reasonably be construed in context to suggest he was *credibly* accused of molestation. Any notion that he was placed on leave for student safety was undermined by the reinstatement letter, which suggested the District was motivated instead by litigation tactics in reinstating him once the filing deadline expired.

---

[2] "A statement is libelous 'per se' when on its face the words of the statement are of such a character as to be actionable without a showing of special damage." (*Slaughter v. Friedman* (1982) 32 Cal.3d 149, 153 (*Slaughter*).)

4

Judge Pollack heard argument on the motion in June 2019. At the start of the hearing, he indicated his tentative decision was to grant the motion. With the parties in agreement that the libel action arose out of the District's protected speech, the burden shifted to Burgess to establish the minimal merit of his claim. Judge Pollack concluded that Burgess did not carry his burden. The press release spoke merely of allegations, not fact, and actions taken by the District in response. Once Burgess publicly denied wrongdoing, the press release was "pretty much what [the court] would expect the school district to do." Although Burgess challenged language suggesting "that there's something against which there needs protection," such language merely tracked the serious allegations of wrongdoing that had emerged. As a separate basis, the court agreed with the District that the official duty privilege applied based on *Morrow, supra,* 149 Cal.App.4th 1424.

Both sides presented arguments. Burgess's counsel maintained there was a factual question precluding application of the official duty privilege. Until the District issued its press release, it consistently expressed that it could not comment on personnel matters. Thus, it remained unclear whether Mueller was acting in accordance with his official duties in issuing the press release. The court disagreed—the press release did not comment on a personnel matter or even mention Burgess by name. All it conveyed was that the District took immediate action on learning of an allegation and would not comment further because it was a personnel matter. This was "entirely appropriate" in the court's view. Turning to the elements of libel, Burgess argued that any suggestion the District took action to protect students was

false, given its explanation for his reinstatement.[3]  The court disagreed; the same letter reinstating Burgess was cautious and continued to recommend that he not be alone with a student.

Confirming its tentative, the trial court granted the anti-SLAPP motion on two separate grounds.  First, the press release contained no false statements of fact:  "Nowhere within the statement is there a suggestion that Coronado actually determined that Burgess had committed the underlying misconduct, only that the *allegations* were so serious that immediate pre-investigation action was required."  Second, it was absolutely privileged under section 47 subdivision (a).[4]

## DISCUSSION

Challenging the anti-SLAPP ruling, Burgess contends he met his burden to establish a probability of prevailing on his libel claim.  Examining the press release under the totality of circumstances, he argues the public would have reasonably inferred that he had been placed on leave based on *credible* concerns for student and staff safety.  To show falsity, Burgess relies on deposition testimony by superintendent Mueller describing him as a

[3]    The reinstatement letter indicated that the alleged victim failed to file suit within the filing deadline.  Relying on this statement, Burgess argued he had been "removed so they could have a litigation defense that said, you know, if this kid files a lawsuit, we've already kicked him out."  Burgess renews this contention on appeal, suggesting the grounds for his reinstatement suggest he was placed on leave "as a litigation tactic" to a potential negligent supervision claim.

[4]    The court clarified in its written order that it confined its analysis to the sole cause of action alleged in the complaint, for libel per se based on the press release.  Other potential claims resting on inadequate investigation or false reports to the Commission of Teacher Credentialing had not been asserted, nor had Burgess sought to amend his complaint before the anti-SLAPP motion was filed.

6

"great teacher" and seeming to doubt whether he posed a threat to student safety. Burgess further relies on the reinstatement letter, claiming the basis for his reinstatement suggests his placement on leave was a mere "litigation tactic." To the extent competing inferences could be drawn, Burgess claims the trial court erred by crediting his employer's non-defamatory interpretation, "since the court's task in an anti-SLAPP motion is to view the evidence in the light most favorable to the plaintiff." In general, Burgess faults the court for "hair-splitting" and construing the press release "in a narrow and technical sense," and argues that, although the trial court found otherwise, *Hawran v. Hixson* (2012) 209 Cal.App.4th 256 is closely on point.

Under the circumstances of this case, we need not definitively determine whether the challenged statements were defamatory because we are compelled to affirm the anti-SLAPP ruling on the alternative ground relied on by the trial court. As held in *Morrow, supra,* 149 Cal.App.4th 1424 on analogous facts, the official duty privilege under section 47, subdivision (a) absolutely shields superintendent Mueller's press release from serving as a basis for tort liability. Because Burgess could not establish a probability of prevailing on his libel claim, the court properly granted the District's motion.

1.    *Anti-SLAPP Overview*

Enacted in 1992, the anti-SLAPP statute seeks to protect defendants from meritless lawsuits that chill their exercise of constitutional rights to speech and petition. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*); Code Civ. Proc., § 425.16, subd. (a).) It does so by authorizing defendants to file a special motion to strike any claims "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue . . . , unless the court determines that the plaintiff has

7

established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).) By creating a summary-judgment-like procedure at the outset of the case, the anti-SLAPP statute provides for early dismissal of actions deemed to be "strategic lawsuits against public participation," or SLAPP suits. (See *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 (*Navellier*).)

A defendant filing an anti-SLAPP motion bears the initial burden to establish that the challenged claim arises from the defendant's protected activity. (*Wilson, supra,* 7 Cal.5th at p. 884; *Baral, supra,* 1 Cal.5th at p. 396.) This requires a prima facie showing that activity underlying a plaintiff's causes of action is statutorily protected. (*Wilson,* at pp. 887–888.) If the defendant makes the required showing, the burden then shifts to the plaintiff to demonstrate that the claim has minimal merit. (*Wilson,* at p. 884.) "The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Baral,* at p. 396.) If the plaintiff cannot make that showing, the court will strike the claim. (*Ibid.*; *Wilson,* at p. 884.)

The parties agree that Burgess's sole cause of action for libel per se arises from the District's protected activity. (See Code Civ. Proc., § 425.16, subd. (e)(2) [anti-SLAPP statute applies to "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"].) The dispute instead centers on the second prong of the anti-SLAPP analysis—whether Burgess met his burden to establish the minimal merit of his claim. We independently review the trial court's ruling

that he did not.  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067; *Morrow, supra,* 149 Cal.App.4th at p. 1436.)

2.      *Official Duty Privilege*

Unchanged since its enactment in 1872, section 47, subdivision (a) designates as privileged any publication made "[i]n the proper discharge of an official duty."  This statutory privilege derives from and must be construed in accordance with common law principles.  (*Saroyan v. Burkett* (1962) 57 Cal.2d 706, 710 (*Saroyan*).)  Its purpose "is to insure efficiency in government by encouraging *policy-making* officials to exercise their best judgment in the performance of their duties free from fear of general tort liability."  (*Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 (*Sanborn*).)  "Stated another way, the purpose of the official immunity accorded government officers is to avoid the 'chilling effect' which the fear of damage suits would have on the energetic performance of the public's business."  (*Kilgore v. Younger* (1982) 30 Cal.3d 770, 782 (*Kilgore*); see *Slaughter, supra* 32 Cal.3d at p. 156 ["no absolute immunity attaches to a state officer who is *acting in a private capacity*"].)  When the privilege applies, "it is not qualified but absolute."  (*Kilgore,* at p. 778.)  "Unlike qualified privileges, it is not negated by malice or other personal motivation of the publisher."  (*Ibid.*)  It precludes all manner of tort claims, except malicious prosecution.  (See *ibid.*)

The trial court relied on *Morrow, supra,* 149 Cal.App.4th 1424 to conclude Burgess could not overcome the official duty privilege.  In that case, following a series of disturbances at a Los Angeles high school, a prominent newspaper interviewed the superintendent of the Los Angeles Unified School District and reported that the high school's principal would be replaced "amid criticism by city and school district officials over his handling of a spate of student brawls that many say have been fueled by racial tensions."  (*Morrow,*

9

*supra,* 149 Cal.App.4th at pp. 1429–1430.) The principal sued the school district for defamation, challenging statements by the superintendent to the press implying that leadership lapses had " 'accelerated' a decision to replace him." (*Id.* at p. 1430.) The trial court granted the district's anti-SLAPP motion, and the appellate court affirmed, finding the press statements absolutely privileged under section 47, subdivision (a). (*Morrow,* at pp. 1440–1441.)

As *Morrow* explained, despite early cases that "refused to apply the privilege to officials below cabinet rank," more recent authorities supported its application to someone at the level of school superintendent. (*Morrow, supra,* 149 Cal.App.4th at pp. 1441–1442.) The privilege applied because the superintendent "was publicly explaining the district's response to a matter of widespread concern, which was one of his official duties." (*Id.* at p. 1443.) That the superintendent later regretted his decision to replace the principal did not preclude its application, as the privilege aimed to shield those acting in good faith from " ' "the constant dread of retaliation" ' " for honest mistakes. (*Ibid.*)

We are faced with nearly identical facts. Burgess sued the District for libel based on its publication of a press release following allegations of child molestation directed at a longtime coach. The press release provided the District's response to a matter of widespread public concern. As suggested by *Morrow*, it "cannot be deemed ministerial or unrelated to a legitimate policymaking function," and therefore the official duty privilege applies. (*Morrow, supra,* 149 Cal.App.4th at pp. 1442–1443.)

Seeking to overcome this result, Burgess argues *Morrow* was wrongly decided or distinguishable. First, he contends the official duty privilege does not apply to actions by lower-ranked government officials. Next, he claims

the press release was a mere ministerial act to which the privilege cannot apply. Finally, he claims issuance of the press release *violated* District policy governing confidentiality and was therefore unprivileged conduct. We address each argument in turn, rejecting them all.

a.    *The privilege extends to subordinate-rank officers.*

Construing the official duty privilege in accordance with common law principles, as we must (*Saroyan, supra,* 57 Cal.2d at p. 710), *Morrow* properly applied it to statements made by a school superintendent.

*Barr v. Matteo* (1959) 360 U.S. 564 is instructive. An acting director of a federal agency issued a press release implying his subordinates were the ones responsible for high-profile misdeeds. When they sued for defamation, the acting director claimed his issuance of the press release was absolutely privileged. The Supreme Court agreed. The privilege enables government officials "to exercise their duties unembarrassed by the fear of damage suits" which might otherwise "appreciably inhibit the fearless, vigorous, and effective administration of policies of government." (*Id.* at p. 571.) Given the complexity and scope of government functions necessitating delegation, the privilege could not "properly be restricted to executive officers of cabinet rank." (*Id.* at pp. 572–573.) "The privilege is not a badge or emolument of exalted office, but an expression of policy designed to aid in the effective functioning of government." (*Ibid.*) Government functions do not "become less important simply because they are exercised by officers of lower rank in the executive hierarchy." (*Id.* at p. 573.)

The California Supreme Court has yet to address whether the official duty privilege applies to lower-ranking government officials. In 1962 it applied the privilege to the state Superintendent of Banks, noting his similar rank to a federal cabinet-level official. (*Saroyan, supra,* 57 Cal.2d at

11

pp. 710–711.)  But in doing so, *Saroyan* did not cite *Barr* or have occasion to consider whether the privilege might also apply to lower-ranking officials.[5]

A decade after *Saroyan*, our high court observed that state courts had extended the official duty privilege "only to high-ranking state and federal officials," whereas *Barr* extended the privilege further.  (*Sanborn, supra,* 18 Cal.3d at pp. 412–413.)  It did not need to resolve that tension, however, as the city clerk "was not exercising policy-making functions when he defamed plaintiff." (*Id.* at p. 413.)  *Sanborn* also underscored that the central aim behind the privilege was "to insure efficiency in government by encouraging policy-making officials to exercise their best judgment in the performance of their duties free from fear of tort liability." (*Ibid.*)  These salutary goals would seem to apply equally to subordinate officers, as *Barr* explained.  The Supreme Court next considered the privilege in *Kilgore, supra,* 30 Cal.3d 770, applying it to statements by the Attorney General.  Although the court again had no occasion to reach the issue, its reliance on *Barr* and expressed concern with "discourag[ing] public officials from providing for the extensive and robust dissemination of information so necessary in a democratic society" suggest broader application of the privilege beyond cabinet-level officials. (*Id.* at pp. 781–782.)

A series of appellate decisions have developed the official duty privilege further and lead us to the inescapable conclusion that it extends to lower-ranking government officials, like superintendent Mueller.  *Royer v.*

---

5      Burgess urges us to follow two appellate decisions decided soon after *Saroyan*, which declined to apply the privilege to lower-ranking officials. (*Frisk v. Merrihew* (1974) 42 Cal.App.3d 319, 323 [school superintendent and school board secretary]; *White v. State of California* (1971) 17 Cal.App.3d 621, 628 [Department of Justice bureau].)  But neither of these cases addressed *Barr*, and more recent California authorities lead us to reject their approach.

*Steinberg* (1979) 90 Cal.App.3d 490 applied the privilege to school board trustees sued for libel based on statements made in a motion they passed as board members. (*Id.* at pp. 500−501.) Citing *Barr* and the policy objectives articulated in *Sanborn*, the *Royer* court explained that the free exercise of governmental decision-making required applying the privilege "not only to 'high-level' state executive officers, but to all state and local officials who engage in the policy-making process." (*Royer,* at p. 501.) *Copp v. Paxton* (1996) 45 Cal.App.4th 829 (*Copp*) arrived at the same conclusion. In *Copp*, a self-proclaimed earthquake expert who criticized schools' use of "duck and cover" for emergency preparedness sued a county emergency services coordinator for defamation after he sent his staff a memorandum counseling them to " 'strenuously rebut' " the expert's advice. (*Id.* at pp. 834−835.) Relying on *Barr* and *Royer,* the *Copp* court explained that earthquake safety "is of vital public concern," particularly "as it relates to schools," and county officials "should be encouraged to engage in frank and open communication on important public issues in order to function effectively in the offices entrusted to them." (*Id.* at pp. 841−843.)

Beyond these authorities, courts have applied the official duty privilege to public statements by city and county attorneys. (*Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 615 (*Tutor-Saliba*) [public comments by a city attorney justifying litigation initiated on the city's behalf]; *Ingram v. Filippo* (1999) 74 Cal.App.4th 1280, 1283 [county district attorney's press release charging school board with minor violations of the Ralph M. Brown Act (Gov. Code, § 54950 et seq.)].) The privilege was also applied to press statements by the Director of the California Department of Corrections and Rehabilitation (CDCR). (*Maranatha Corrections, LLC v. Dept. of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1088−1089 (*Maranatha*).)

13

In short, *Morrow* is no outlier, and we decline Burgess's invitation to reject it. As *Barr* suggests, it is not an officer's *title* but rather the relation between the conduct at issue and the officer's lawful *duties* that dictates whether the privilege applies. (*Barr, supra,* 360 U.S. at pp. 573–574.) Following *Morrow*'s reasoned approach, we conclude the official duty privilege can apply to statements made by a school superintendent.

b.      *Issuance of the press release was not a ministerial action.*

Burgess next contends that the privilege does not apply because Mueller was performing a ministerial role in issuing the press release. The official duty privilege extends to acts by a qualifying government official "in the exercise of an executive function." (*Saroyan, supra,* 57 Cal.2d at p. 710.) We focus on whether the official's conduct "was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." (*Barr, supra,* 360 U.S. at p. 575.) The privilege is construed broadly, "to encompass all discretionary acts essential to the proper exercise of an executive function." (*Copp, supra,* 45 Cal.App.4th at p. 844.)

The official duty privilege has long been applied to press releases issued by government officials explaining or justifying their policy decisions. "It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty." (*Barr, supra,* 360 U.S. at p. 575 [privilege applied to press release by acting agency director announcing a personnel decision].) " 'Because a public official's duty includes the duty to keep the public informed of his or her management of the public business, press releases, press conferences and other public statements by such officials are covered by the 'official duty' privilege . . . .' " (*Maranatha, supra,* 158 Cal.App.4th at p. 1089 [privilege

applied to press release by CDCR director "in defense of a policy decision she made" to terminate a private contractor for misappropriating funds].)

*Morrow* held that a school superintendent's statements to the press commenting on a principal's leadership could not "be deemed ministerial or unrelated to a legitimate policymaking function." (*Morrow, supra,* 149 Cal.App.4th at pp. 1442−1443.) Rather, the statements publicly explained the school district's response to a matter of widespread concern, consistent with the superintendent's official duties. (*Id.* at p. 1443.) So too here. Mueller's decision to respond to multiple press inquiries about child molestation allegations against a longtime high school coach plainly fell within the scope of his duties as school superintendent. As shown by the number of press inquiries prompted by the initial Reader article, the allegations and the District's response plainly involved an issue of widespread concern. It would construe a superintendent's role too narrowly to deem the press release "ministerial."[6] This case is similar to *Morrow, Barr,* and *Marantha*, where lower-ranking officials issued press releases to

[6]     Burgess's authorities are distinguishable. In *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136, it was unclear whether a university vice chancellor was acting in a policymaking role when he responded to a public records request by releasing an internal veterinary report on cattle deaths at a ranch. (*Id.* at pp. 1142−1143.) In *Sanborn, supra,* 18 Cal.3d 406, a city clerk may have had discretion to speak to the press but was not acting in a policymaking role when he told local press that an attorney had done " 'a real con job' " in persuading him to release attached funds without a court order. (*Id.* at pp. 410, 413.) *McQuirk v. Donnelly* (9th Cir. 1999) 189 F.3d 793 is further afield, involving negative comments by a sheriff made to the prospective employer of a former employee. "Not surprisingly, the court concluded that answering requests for employment references is part of the ministerial, or operational, duties of any employer, and certainly did not relate to the policy-making, law enforcement functions of a county sheriff." (*Tutor-Saliba, supra,* 136 Cal.App.4th at p. 616.)

explain or defend a policy decision implicating a matter of public concern. Simply put, Mueller's press statement was central (and not tangential) to his executive role as District superintendent.[7]

      c.     *Any claim that the press release violated the District's confidentiality policies lacks minimal merit.*

Application of the official duty privilege requires "the *proper* discharge of an official duty." (§ 47, subd. (a), italics added; see *Hale Co. v. Lea* (1923) 191 Cal. 202, 207 [state laboratory director exceeded his statutory authority in warning out-of-state official about adulterated walnuts].) Burgess attempts to distinguish *Morrow* on factual grounds, arguing that District policy prohibited Mueller from issuing the press release. But examining the policies he cites against the challenged press release, Burgess fails to show how the release *violated* those policies. (See, e.g., *Kilgore, supra,* 30 Cal.3d at pp. 780–781 [general demurrer properly sustained where complaint did not allege that the Attorney General's report naming mob suspects derived from or illegally disseminated confidential information].)

In his opposition papers, Burgess attached copies of two confidentiality policies that he cites on appeal. Administrative Regulation 4112.6 governs the appropriate handling of "Personnel Files" and requires the superintendent to "maintain the confidentiality of any personnel records which, if inappropriately disclosed, would constitute an unwarranted invasion of the employee's policy." Board Policy 4119.23 proscribes "Unauthorized Release of Confidential/Privileged Information." "Staff shall maintain the confidentiality of information acquired in the course of their

---

7    Burgess suggests there was no *extant* reason to warn the community by issuing the press release given his placement on leave months before. But with his reinstatement occurring only two months later and investigations ongoing, there remained an extant basis to respond.

employment.  Confidential/privileged information shall be released only to the extent authorized by law."  Tracking the statutory definition for confidential information found in Government Code section 1098, subdivision (b), Board Policy 4119.23 defines as confidential "information that is not a public record subject to disclosure under the Public Records Act [(Gov. Code, § 6250 et seq.)], information that by law may not be disclosed, or information that may have a material financial effect on the employee."

Nothing in the press release violated these policies.  The release merely conveyed the District's concern for student and staff safety, mentioned that allegations were made against a staff member that the District took "very seriously," and indicated that the District responded by following "policy and protocol by taking immediate action to protect" students and staff.  The press release went no further, indicating that the matter concerned a personnel issue.

As the trial court found and the District argues, nothing in this boilerplate statement disclosed information from Burgess's personnel records or otherwise divulged confidential material.  All that was conveyed was that the District took action consistent with its policies, without so much as describing what action the District took.  By the time the statement was issued, more sensitive information was already in the public domain by virtue of Burgess's writ petition, which documented his history coaching at the high school, challenged his "illegal suspension," and protested the

District's threats of discipline "for texting students" and its admonition "that he could not be present at the pool for any reason."[8]

In short, Burgess had the burden to establish the minimal merit of his libel claim. Nothing in his opposition papers sufficed to overcome the official duty privilege under section 47, subdivision (a). Instead, as *Morrow* found on similar facts, the privilege shields Mueller from tort liability for issuing a press release in his capacity as superintendent in response to media inquiries on a matter of widespread concern.

## DISPOSITION

The order granting the District's anti-SLAPP motion is affirmed. The District is entitled to recover its costs, including statutory attorney's fees, on appeal. (See Code Civ. Proc., § 425.16, subd. (c)(1); *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1426.)

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

AARON, J.

---

[8]     Burgess makes much of the fact that the District *previously* declined to comment in response to press inquiries. This overlooks that once the first article was published and requests for comment flowed in, it was within Mueller's purview and discretion as superintendent to respond in the manner he did to a matter of increasing concern. (See *Morrow, supra,* 149 Cal.App.4th at pp. 1442–1443.)