Filed 6/26/13  Olson v. George CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| KIMBERLY R. OLSON,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>RAY GEORGE,<br><br>        Defendant and Respondent. | C069332<br><br>(Super. Ct. No. SCSCCVPO101640) |

Plaintiff Kimberly R. Olson appeals from a judgment of dismissal following defendant Ray George's successful motion to strike her complaint pursuant to Code of Civil Procedure section 425.16 (unless otherwise stated, statutory references that follow are to the Code of Civil Procedure), commonly referred to as an anti-SLAPP motion.

"SLAPP is an acronym for Strategic Lawsuit Against Public Participation. SLAPP litigation, generally, is litigation without merit filed to dissuade or punish the exercise of First Amendment rights of defendants.  [Citations.]"  (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858.)

1

Olson contends the trial court erred when it granted George's anti-SLAPP motion. She also challenges the court's denial of her motion for limited discovery and her request for leave to amend the complaint. We affirm the judgment.

FACTS AND PROCEEDINGS

The town of Hornbrook is located in Siskiyou County. The Hornbrook Community Services District (HCSD) is the public water district, serving approximately 140 users in the Hornbrook community. The HCSD's board of directors (HCSD Board) is comprised of five members appointed by the Siskiyou County Board of Supervisors. Olson and George are members of the Hornbrook community. Both actively participate in matters concerning the HCSD.

On May 24, 2010, Hornbrook resident Ron Cox submitted a letter to the Siskiyou County Clerk stating his interest in appointment to a position on the HCSD.

On June 5, 2010, Olson submitted her letter of interest in the HCSD position to the HCSD Board and the County Clerk.

In June and July, 2010, George circulated a petition to members of the Hornbrook community encouraging appointment of Cox to the HCSD Board and discouraging appointment of Olson. George also spoke to several community members asking if they would sign the petition to show their support for Cox.

On August 10, 2010, the Board of Supervisors met in regular session and appointed Cox to the HCSD Board.

In September 2010, George circulated another document entitled "Petition for Removal of Larry Schultz both as Chairman and member of [HCSD]" (the Petition) to members of the Hornbrook community. The Petition, directed to the Siskiyou Board of Supervisors, sought removal of Schultz as chairman and member of the HCSD Board. The Petition also made numerous references to Olson, alleging her negative influence

2

over Schultz, and urged that she not be appointed to the HCSD Board. Relevant portions of the Petition are as follows:

"Larry Schultz is the current chairman of the [HCSD]. It seems everything he does is at the instigation, request, and approval of . . . Olson and Peter Harrell. . . . These two people have a record in this County of bringing lawsuits or threats of lawsuits against anyone who does not act as they wish for whatever reasons. It is for this reason we are not able to get people we trust to serve as members on the [HCSD] Board and for this reason we cannot remove Mr. Schultz ourselves. When threats were made by the [Olson/Harrell] team, Mr. Schultz not only participated in their harassment but failed to intervene in his capacity as Chairman. In the past year four good HCSD Board members have resigned because of those threats and because of badgering and harassment both by him and the [Olson/Harrell] team. Many members of our community have been frightened away from attending the HCSD meetings by the threat of lawsuits by these two people. [¶] . . . [¶]

". . . At the instigation of [Olson and Harrell], [Schultz] was verbally abusive to our previous trusted bookkeeper Elsa, an employee for 12 years, and caused her removal. . . . [¶] . . . Larry Schultz acts as the only person with authority on the entire HCSD Board. He listens to no one except [Olson] and [Harrell]. . . . [¶] . . . [¶]

". . . It is also very suspicious that [Olson] wrote an eloquent letter expressing concerns over the mining company's plan to the Siskiyou Public Health and Community Development Department . . . . After that letter and the next HCSD Board meeting not once did she ever bring it up again at a HCSD Board meeting.

". . . In front of a witness, Larry Schultz stated he knew what the agenda of [Olson] and [Harrell] is. He has never told the other HCSD Board [*sic*] what he knows. . . .

". . . A recent HCSD Board member negotiated the use of the local Grange Hall for a public meeting place. . . . It was not done, and some time after the November

3

meeting the Grange requested the key to their building back as the insurance problem had not been addressed and they did not intend to be sued by the [Olson] and Harrell team. . . .[¶]

". . . We expect [Olson] to again attempt to become an HCSD Board member.  We are asking you to please not affirm her.  We do not trust her as her lack of action concerning the mining operation and it's [sic] impacts on our wells is suspicious.  And we do not want a person with the record she has of threatening or filing lawsuits all over the County whenever she does not get her way.  We do not want her to represent us.  Her presence on the HCSD [Board] would be sufficient to continue to scare our community from involvement.  [¶]  We want our community back.  We want to have people we can trust and we want our people to be able to act in our best interests without constant threat of lawsuits.  Please help us attempt to regain control by removing Larry Schultz as both as [sic] Chairman and a member of the HCSD Board and please do not approve [Olson] as a HCSD Board member."

George circulated the Petition door-to-door to a number of Hornbrook community members, including Roger Gifford.  George told Gifford that Cox had resigned and that "they" wanted to keep Olson from getting an appointment to the HCSD Board.  George also told Gifford that Olson grew marijuana and "was selling [it] to kids," that she was suing the county, and that she "had made trouble for people in Hornbrook."

On January 3, 2011, the Siskiyou Daily News printed an article discussing the Petition, prompting the Siskiyou Board of Supervisors to place the matter on its agenda for discussion.  The Supervisors subsequently met and discussed matters raised in the Petition.

*Olson's Complaint*

On December 9, 2010, Olson filed a complaint against George and other defendants (the Complaint) alleging slander, defamation, interference with contract, false

4

light, and intentional infliction of emotional distress, and seeking compensatory and punitive damages. With few exceptions, the allegations supporting each cause of action in the Complaint were identical, namely that, from September 8, 2010, through December 8, 2010, "[d]efendants did knowingly and maliciously make false statements concerning Plaintiff, both verbally and in writing, such statements attributing criminal acts to Plaintiff, and impinging her moral character. Said verbal and written statements were circulated throughout the town of Hornbrook and surrounding area, and were calculated to cause, and did cause, lasting emotional and psychological pain and distress to Plaintiff. [¶] Defendants further conspired amongst themselves to create, circulate, and publish these false statements to the public, and to the public record, all for the purpose of denigrating Plaintiff in the eyes of the community, and to prevent her from seeking and obtaining public office." The first and second causes of action alleged the conduct was "ongoing."

Olson's claim for exemplary damages against George alleged that "[t]he acts complained of are ongoing, and are known to [George] not to be true," and that George's purpose in making the false statements was "to harm [Olson], and [Olson's] reputation, and also to embarrass and intimidate her into declining to seek public office after having submitted her letter of intent to do so."

*George's Motion to Strike Portions of the Complaint*

On January 6, 2011, George filed a motion to strike from the Complaint the word "maliciously," the claim for exemplary damages, and the prayer for punitive or exemplary damages, arguing Olson failed to allege specific facts to demonstrate malice.

On January 11, 2011, Olson filed a subpoena requesting that George produce a copy of the Petition. Olson argued there was good cause for the request because, among other things, the documents evidenced defamation and malice by George as alleged in the Complaint.

5

On January 27, 2011, Olson filed an opposition to George's motion to strike. A copy of the Petition was attached as an exhibit to the opposition.

On April 29, 2011, the trial court found there was an insufficient factual basis to support the allegation of malice and issued an order granting the motion without leave to amend, thereby striking the term "maliciously" from all causes of action and striking the claim for exemplary damages. Olson filed a motion for reconsideration of the court's order.

*Defendant's Anti-SLAPP Motion*

On February 8, 2011, George filed an anti-SLAPP motion. In support of the anti-SLAPP motion, George filed several declarations, including his own, to which he attached the Petition as an exhibit.

On February 18, 2011, Olson filed a motion for limited discovery as provided for in the anti-SLAPP statute (§ 425.16, subd. (g)), seeking responses to 31 special interrogatories. George opposed the motion.

On March 8, 2011, the trial court granted Olson's discovery motion as to just one of the requested interrogatories (Interrogatory No. 8). Interrogatory No. 8 sought information to support George's claim that he believed Schultz was "improperly running the HCSD," that Schultz "blindly relied on the direction and comments of [Olson] and [Harrell], and that "[Olson] and [Harrell] were acting as *de facto* officers and directors of HCSD."

George propounded a response to Interrogatory No. 8 which stated, in part, that George did not draft the Petition but he believed the statements therein to be true and accurate based on "his personal observation of [Olson] and on general information received from members of the Hornbrook community regarding actions and statements of [Olson]." The trial court denied Olson's motion to compel further responses.

6

On April 15, 2011, Olson filed her response to the anti-SLAPP motion, supported by her own declaration and the declarations of Gifford, Harrell, and Schultz. Olson denied the statements in the Petition and further denied that she had ever "sold or given away any of [her] medical marijuana, or prescription medications to anyone."

On July 18, 2011, the trial court issued its order granting George's anti-SLAPP motion. The court found the Petition "was circulated in a public forum about a topic of public interest"--the performance of Schultz, a publicly appointed official, and his removal from the HCSD Board. The court further found that the oral statements by George to Gifford were "clearly associated with the Petition." As such, the court concluded, both were protected speech within the meaning of section 425.16. The court found the Complaint did "not appear to be 'legally sufficient' because it fails to identify the statements (or their gist) at issue," but nonetheless addressed the substantive issues, finding Olson was a limited public figure because "she voluntar[ily] injected herself into the issues of the HCSD, the issues of the appointment to the HCSD were publicly debated, and the alleged defamations were germane to the controversy." The court further found Olson had not made a threshold showing as to the probability of prevailing on the issue of malice. Judgment was entered accordingly on August 3, 2011, rendering moot Olson's request for reconsideration of the order granting George's earlier motion to strike portions of the Complaint.

Olson timely appealed.

DISCUSSION

I

*Legal Principles*

"'[S]ection 425.16 requires that a court engage in a two-step process when determining whether a defendant's anti-SLAPP motion should be granted. First, the court decides whether the defendant has made a threshold showing that the challenged

7

cause of action is one 'arising from' protected activity.  (§ 425.16, subd. (b)(1).)

[Second,] [i]f the court finds such a showing has been made, it then must consider

whether the plaintiff has demonstrated a probability of prevailing on the claim.

[Citation.]'  [Citation.]"  (*Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430, 1447; see

also *Premier Med. Management Systems, Inc. v. California Ins. Guar. Assn.* (2006) 136

Cal.App.4th 464, 476.)

We review the trial court's order granting the anti-SLAPP motion de novo.

(*Cabrera v. Alam* (2011) 197 Cal.App.4th 1077, 1086.)  " ' "We consider 'the pleadings,

and supporting and opposing affidavits . . . upon which the liability or defense is based.'

[Citation.]  However, we neither 'weigh credibility [nor] compare the weight of the

evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and

evaluate the defendant's evidence only to determine if it has defeated that submitted by

the plaintiff as a matter of law.'  [Citation.]"  [Citation.]'  [Citation.]  We further observe

that the anti-SLAPP statute is to be broadly construed.  (§ 425.16, subd. (a).)"  (*Ibid.*; see,

also *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699-

700.)

II

*George Made a Threshold Showing that the Challenged Conduct*
*Underlying Olson's Claims Arose From Protected Activity*

A defendant moving to strike a complaint pursuant to section 425.16 must

demonstrate that the conduct complained of in the complaint arose from an " 'act in

furtherance of a person's right of petition or free speech under the United States or

California Constitution in connection with a public issue.' "  (§ 425.16, subd. (e); see also

*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 820 (*Wilcox*), disapproved on other

grounds by *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 58-67.)

The defendant may meet this burden by showing the conduct which forms the basis for

the plaintiff's cause of action falls within one of the four categories of protected activity

8

set forth in section 425.16, subdivision (e) (hereafter, § 425.16(e)), including "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (See *Wilcox,* at p. 820.)

In analyzing the first prong of an anti-SLAPP motion, the focus is on "the substance of the plaintiff's lawsuit." (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 669–670.) "In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) Defendant need not *establish* that his action is constitutionally protected; rather, he must make a prima facie showing that plaintiff's claim arises from an act taken to further defendant's rights of petition or free speech in connection with a public issue. (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1365; *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 675 (*Macias*).)

## A.     *Identification of Statements at Issue*

As a preliminary matter, the Complaint does not specifically identify the challenged statements, referring only generally to false statements made by George about Olson, both verbally and in writing, attributing criminal acts to her and damaging her moral character by circulating statements throughout the town of Hornbrook, and publishing statements to the public for the purpose of denigrating her in the eyes of the community and preventing her from seeking and obtaining public office.

Deficiencies in the Complaint notwithstanding, the parties and the trial court proceeded on the premise that the challenged statements consist of written statements set forth in the Petition and George's verbal statements to Gifford as identified in Gifford's declaration, and we thus confine our review to those statements.

9

B.      *George Established the Statements Underlying Olson's Claims Were Made in a Public Forum for Purposes of Section 425.16(e)(3).*

"A 'public forum' is traditionally defined as a place that is open to the public where information is freely exchanged.   [Citation.]" (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 475 (*Damon*) [newsletter published by private homeowners club and circulated to association members' residents and neighboring businesses is a public forum].)  "Under its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication." (*Id.* at p. 476.)  The term "public forum" is subject to broad interpretation.  (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1006.)

In *Matson v. Dvorak* (1995) 40 Cal.App.4th 539 (*Matson*), Concerned Citizens for Responsible Leadership, a group funded by various persons and entities including Eugene J. Dvorak, mailed campaign flyers to the homes of an unspecified number of voters accusing candidate Paul Matson of having unpaid citations and fines.  After losing the election, Matson sued Dvorak and other defendants for claims including libel and invasion of privacy.  Dvorak filed an anti-SLAPP motion pursuant to section 425.16. (*Matson,* at p. 543.)  The trial court granted the motion.  (*Id.* at p. 545.)

Matson appealed and this court affirmed, concluding the mailing of a campaign flyer to an unspecified number of voters' homes was an act in furtherance of the defendant's constitutional right of petition or free speech in connection with a public issue for purposes of the anti-SLAPP statute. (*Matson, supra,* 40 Cal.App.4th at pp. 543, 548.)

The court in *Macias, supra,* 55 Cal.App.4th 669, came to a similar conclusion. There, the plaintiff filed a defamation action after the defendant distributed political flyers to members of a union during the course of a campaign to elect union officers. (*Id.* at pp. 671-672.)  The trial court granted defendant's anti-SLAPP motion. (*Id.* at p. 672.)

10

The court of appeal affirmed, finding campaign statements made during a union election constituted a public issue because the statements affected 10,000 union members and concerned the plaintiff's qualifications to run for office, and that "[s]peech by mail, i.e., the mailing of a campaign flyer, is a recognized public forum under the SLAPP statute." (*Id.* at p. 674; see also *id.* at pp. 673-674.)

The same is true here, where George circulated the Petition "around town" and door-to-door to "residences of community members," discussing its contents and collecting the signatures of more than 100 people from over 80 homes. "The [anti-SLAPP] statute does not limit its application to certain types of petition activity. The Legislature recognized that 'all kinds of claims could achieve the objective of a SLAPP suit--to interfere with and burden the defendant's exercise of his or her rights.' " (*Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 949, quoting *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 652.) Whether mailed or circulated by hand, the result is the same--the dissemination of information to the homes of those who may have an interest in that information. Many an idea has been exchanged on a resident's stoop about a candidate in an upcoming election or an agenda item at the next city council meeting. "[A]s every person acquainted with political life knows, door to door campaigning is one of the most accepted techniques of seeking popular support . . . ." (*Martin v. Struthers* (1943) 319 U.S. 141, 146.) Thus, the statements at issue here, including those spoken to Gifford during circulation of the Petition, were made in a "public forum" for purposes of the anti-SLAPP statute.

C.      *George Established the Statements Were Made in Connection With an Issue of Public Interest Within the Meaning of Section 425.16(e)(3).*

"The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech. 'Public discussion about the qualifications of those who hold or who wish to hold positions of public trust presents the

11

strongest possible case for applications of the safeguards afforded by the First Amendment.' [Citation.] It is axiomatic that the qualifications of a declared candidate for public office is a public issue." (*Matson, supra*, 40 Cal.App.4th at p. 548.)

We first turn to the Petition, which accuses Olson of undue influence over Schultz as president of the HCSD Board; having a record of suing or threatening to sue; threatening to sue four HCSD Board members, causing them to resign; causing community members to avoid board meetings for fear of being sued; instigating verbal abuse by Schultz against the HCSD bookkeeper and causing her "removal" from that position; and having written "an eloquent letter expressing concerns" over a proposed mining operation but failing thereafter to bring the matter up to the HCSD Board. The Petition also states that George and other community members "expect [Olson] to again attempt to become an HCSD Board member" and asks that the Board of Supervisors "please not affirm her" because they "do not trust her . . . [and] do not want a person with the record she has of threatening or filing lawsuits all over the County whenever she does not get her way. We do not want [Olson] to represent us. Her presence on the HCSD would be sufficient to continue to scare our community from involvement."

The statements in the Petition concern governance of the HCSD, Olson's interest in potential appointment to its Board, and her qualifications for that position, all issues of interest to the Hornbrook community. In support of his anti-SLAPP motion, George produced letters submitted by Olson and Cox regarding their interest in the vacancy on the HCSD Board, letters of Hornbrook residents favoring Cox to fill that vacancy, the Board of Supervisors' agenda and its minutes appointing Cox to the HCSD Board, the Petition itself (including pages containing the signatures of many Hornbrook residents), copies of court records of cases involving Olson, and various news articles on SiskiyouDaily.com and in the Siskiyou Daily News regarding issues related to the Petition, the HCSD, and the Hornbrook water supply. These written statements concern issues of public interest and are therefore protected under section 425.16(e)(3).

12

As for verbal statements by George, Gifford's declaration twice states that George made several comments about Olson "to induce me to sign [the Petition]," including that Olson "was selling marijuana to kids, so she had to be kept off the water board." Gifford's declaration makes plain that George's statements concerned matters set forth in the Petition and were designed to induce Gifford to sign the Petition to prevent Olson from obtaining a seat on the HCSD Board. Accordingly, this conversation also is protected under the anti-SLAPP statute. (See *Macias, supra,* 55 Cal.App.4th at p. 674 [Private conversations concerning a campaign flyer regarding a union election "would also be protected"]; *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1117 [written and verbal comments concerning an official investigation were in furtherance of right to petition government for grievances]; *Wilcox*, *supra*, 27 Cal.App.4th at pp. 821-822 [statements exhorting shorthand reporters to contribute to cost of pursuing litigation to challenge "direct contracting" were rationally connected to underlying judicial challenge and hence protected under § 425.16]; *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 18-20 [recruiting and encouraging others to speak out on matter of public interest came within protection of § 425.16]; *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170, 1175-1176, [private conversations regarding petition to city council and letter to local newspaper opposing proposed project to put shelter for battered women in residential neighborhood are protected under the anti-SLAPP statute].) Having concluded the statements were made in connection with an issue of public interest within the meaning of section 425.16(e)(3), we need not consider Olson's contention that the statements are not protected under section 425.16(e)(4).

Olson also argues George failed to demonstrate the issues in the Petition were under consideration by any public body or tribunal at the time of its circulation, and likewise failed to offer evidence of public meetings, rallies, or other gatherings "or legitimate petitioning activity" concerning the Petition prior to January 1, 2011, the date she filed her Complaint. Again, while the issues raised in the Petition were not yet on the

13

Board of Supervisors' agenda for discussion at the time the Petition was circulated, it is clear that matters concerning governance of the HCSD, the Hornbrook water supply, and Olson's potential appointment to the HCSD Board were of interest to members of the Hornbrook community, as evidenced by the significant number of signatures attached to the Petition, as well as newspaper articles concerning those issues. Further, as the trial court pointed out, issues raised in the Petition were eventually calendared and discussed in early-January 2011.

Conceding that "operation of a water district . . . is undoubtedly an issue of public interest when considered in the abstract," Olson nonetheless argues the Petition attacks her not as a sitting board member, but as a private citizen and customer of the water district and is thus not a matter of public interest. We disagree. The statements regarding Olson refer to her alleged influence over the president of the HCSD Board, as well as her potential appointment to fill the vacancy left by the departure of Cox, and matters impacting the Hornbrook water supply. These are matters of public interest to those served by the HCSD.

Olson disputes the relevancy of her prior submission for the HCSD Board position, and argues there was no evidence the challenged statements were connected to an " 'ongoing controversy, dispute or discussion.' " (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 738, quoting *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 118 (*Du Charme*).) However, whereas *Hailstone* and *Du Charme* dealt with labor union activities or " 'private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity' " (*Du Charme,* at p. 115), the Petition here deals with the governance of the HCSD, a public agency, and its management of the Hornbrook water supply and thus, by definition, involves a matter of public interest. (See *Du Charme,* at p. 115*; Damon, supra,* 85 Cal.App.4th at p. 479; *Macias, supra,* 55 Cal.App.4th at p. 674.)

14

Moreover, evidence presented by George demonstrates that a significant number of Hornbrook community members were concerned about current and future issues relating to governance of the HCSD Board, as well as Olson's declaration of interest in a position on the board, the Board of Supervisors' subsequent appointment of another candidate (Cox) to that position, Cox's departure, and the potential that Olson would again seek to fill the vacancy left by Cox. To that end, George's statements to Gifford concerned matters impacting Olson's qualifications for that position. This type of public discussion about Olson's qualifications as a recent and potential contender for the Board position "presents the strongest possible case for applications of the safeguards afforded by the First Amendment." (*Matson, supra*, 40 Cal.App.4th at p. 548, quoting *Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 154.) Having concluded the challenged statements were made in connection with an issue of public interest within the meaning of section 425.16(e)(3), we need not consider Olson's argument that the Petition was not "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" within the meaning of section 425.16(e)(2).

On this record, we have no trouble concluding George made a prima facie showing that Olson's claims arose from his circulation of the Petition and concomitant conversation with Gifford, both of which occurred in a public forum and related to issues of public interest, and both of which were therefore actions taken to further his rights of petition or free speech in connection with a public issue as outlined in section 425.16(e)(3). (*Macias, supra,* 55 Cal.App.4th at p. 675.)

III

*Olson Failed to Make a Threshold Showing of a Probability of Prevailing on Her Claim*

Having concluded that George made a prima facie showing that the challenged statements arose from protected activity, we now must determine whether Olson

15

established a "probability" that she will prevail on the merits of her Complaint. (§ 425.16, subd. (b).) To do so, Olson must demonstrate that her Complaint "is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. [Citation.] Whether [s]he has done so is a question of law, which we determine de novo. [Citations.]" (*Matson, supra*, 40 Cal.App.4th at p. 548.)

As previously discussed, the Complaint fails to identify the allegedly defamatory statements. Although a plaintiff claiming slander or libel need not plead the allegedly defamatory statement verbatim, the statement must, at the very least, be specifically identified. (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 458.) The same is true for a claim of false light. (*Briscoe v. Readers Digest Assoc. Inc.* (1971) 4 Cal.3d 529, 543, overruled on other grounds in *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 685.) Hence, as the trial court noted, the Complaint does not appear to be legally sufficient.

Apparently conceding the insufficiency of the Complaint, Olson argues the trial court erred in denying her leave to amend to allege sufficient facts, namely the written statements in the Petition and the verbal statements George made to Gifford. In that regard, we note that our review of the trial court's ruling on the anti-SLAPP motion encompasses " 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' [Citation.]" (*Cabrera v. Alam, supra,* 197 Cal.App.4th at p. 1086.) We therefore consider the Complaint in conjunction with, among other things, the Petition and Gifford's declaration.

## A.     *Olson Was a Limited Public Figure*

In order to determine whether Olson made a threshold showing of a probability of prevailing on her claims, we must first determine her status, that is, whether she was a

16

public figure, a limited public figure, or a private figure. As we will explain, Olson was a limited public figure.

"The United States Supreme Court has defined two categories of public figures for First Amendment analysis. First, the 'all purpose' public figure who has 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' The second category is the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' " (*Mosesian v. McClatchy Newspapers* (1991) 233 Cal.App.3d 1685, 1689, quoting *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 351 [41 L.Ed.2d 789, 812]; see also *Cabrera v. Alam, supra*, 197 Cal.App.4th at p. 1091; *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 844 (*Copp*).)

In order to characterize a plaintiff as a limited purpose public figure, courts must first find that there was a public controversy. (*Copp, supra,* 45 Cal.App.4th at p. 845.) That is, "the issue was being debated publicly and . . . had foreseeable and substantial ramifications for nonparticipants." (*Ibid*.) Next, the court must find the plaintiff undertook " 'some voluntary act through which [s]he seeks to influence the resolution of the public issues involved.' " (*Ibid.*, quoting *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254, fn. omitted.) " 'Finally, the alleged defamation must have been germane to the plaintiff's participation in the controversy.' " (*Copp, supra*, at p. 846.) With respect to the second element, "[i]t is not necessary to show that a plaintiff actually achieves prominence in the public debate; it is sufficient that '[a plaintiff] attempts to thrust [herself] into the public eye [citation] or to influence a public decision.' " (*Id.* at pp. 845-846.)

We recognize, as did the trial court, that a defendant cannot, by his own conduct, make the plaintiff a public figure. (*Khawar v. Globe International, Inc.* (1998) 19 Cal.4th 254, 266.)

17

Here, there was a public controversy--governance of the HCSD, particularly the manner in which the existing Board was managing the HCSD, the availability of a position on the Board both prior to Cox's appointment and after his departure soon thereafter, and Olson's interest in filling that vacancy--all of which had foreseeable and substantial ramifications for the Hornbrook community members serviced by the HCSD. The controversy was ongoing. Cox and Olson submitted their letters of interest in the position in May and June, 2010, respectively. George circulated the first petition in June or July, 2010, discouraging the Board of Supervisors from appointing Olson. The Board of Supervisors did not fill the position until August 10, 2010, when it appointed Cox. However, he quickly vacated the position, prompting George to begin circulating the Petition in September 2010, again attempting to discourage the Board of Supervisors from appointing Olson to fill the vacancy. This public issue was eventually introduced as an agenda item at a meeting of the Board of Supervisors on January 4, 2011, with Olson and Schultz participating in the discussions.

Olson voluntarily injected herself into the public controversy when she submitted her name for consideration and thereby sought to influence matters related to the HCSD. She was not appointed and therefore did not actually achieve prominence in that regard. However, the person who was appointed, Cox, vacated the position approximately one month later, and thus Olson's previous interest in the position once again became relevant, and she continued to be involved in issues related to the HCSD. Indeed, by her own admission, she attended HCSD meetings "regularly" and filed a written opposition to a potential mining operation threatening to impact the Hornbrook water supply. These collective actions demonstrate Olson's attempts to interject herself into, and have influence over, public issues surrounding the HCSD.

The challenged statements were germane to Olson's participation in the public issues facing the HCSD. The Petition discussed Olson's alleged influence over Schultz; her litigiousness, both generally and against members of the HCSD Board in particular;

18

her behavior at Board meetings and its effect on members of the community; her involvement in conduct related to the HCSD bookkeeper; and her failure to bring her concerns over a proposed mining operation to the Board for discussion. The Petition discussed George's belief that Olson would again seek a seat on the HCSD Board, and implored the Board of Supervisors not to appoint her to that position. Similarly, George sought to induce Gifford to sign the Petition by telling him Olson sold marijuana to children. George's statements, both verbal and written, were germane to Olson's participation in the process of filling the vacancy on the Board, her qualifications to do so, and her influence over governance of the HCSD.

Olson argues George impermissibly caused her to be a public figure by his own conduct of "creating a document from nothing, presenting it to his select friends and associates for signatures . . . and then presenting the document to a County supervisor a month after he'd been sued." Again, we disagree. As previously discussed, Olson submitted her letter of interest in the Board position presumably to participate not only in matters related to governance of the Board, but also in management of issues within the Board's jurisdiction such as proposed mining operations and other issues potentially effecting the community's water supply. While the position she expressed interest in was initially filled when the Board of Supervisors appointed Cox, her initial interest in the position was nonetheless relevant when, just one month later, the position was once again vacant and George began circulating the Petition encouraging the Board of Supervisors to remove Schultz as president and not to appoint Olson to fill any existing vacancy.

Citing *Copp, supra,* 45 Cal.App.4th 829, Olson argues she cannot be characterized as a public figure because she was never a candidate for public office and never availed herself of the media or took steps to publicly counter the challenged statements. *Copp*, however, does not require that a person present herself as a candidate for public office, or that she utilize the media or publicly challenge the statements, only that she undertake " 'some voluntary act through which [s]he seeks to influence the resolution of the public

19

issues involved.' " (*Id.* at p. 845; see also *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 24-26.) As previously discussed, Olson did just that when she submitted her letter of interest in the vacant HCSD Board position and participated in HCSD meetings and HCSD-related matters.

Olson was a limited public figure with respect to issues related to the governance and activities of the HCSD Board and her potential appointment thereto.

B.      *Malice*

A limited purpose public figure who sues for defamation must establish "a probability that she will be able to produce clear and convincing evidence of actual malice," that is, that the allegedly defamatory statement was made " 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1167 (*Annette F.*); see *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280; *Copp, supra*, 45 Cal.App.4th at p. 846.)

"The burden of proof by clear and convincing evidence 'requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.' " (*Copp, supra,* 45 Cal.App.4th at p. 846.)

"The reckless disregard test requires a high degree of awareness of the probable falsity of the defendant's statement. ' "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." ' [Citations.] This is a subjective test, focused on the defendant's attitude toward the veracity of the published material, as opposed to his or her attitude toward the plaintiff. [Citation.] [¶] Actual malice may be proved by circumstantial or direct evidence. [Citation.] However, we will not infer actual malice solely from evidence of ill will, personal spite or bad motive. [Citation.]" (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1579.)

"Gross or even extreme negligence will not suffice to establish actual malice; the defendant must have made the statement with knowledge that the statement was false or with 'actual doubt concerning the truth of the publication.' [Citation.]" (*Annette F., supra,* 119 Cal.App.4th at p. 1167.)

In opposition to the anti-SLAPP motion, Olson produced her own declaration, and the declarations of Gifford, Schultz, Harrell, and William Eddy. Olson's declaration denies the truthfulness of much of the Petition's content, as well as the statement George made to Gifford. However, the declaration provides no evidence that George either knew those statements to be false or entertained serious doubts as to their truthfulness.

The declarations of Gifford, Schultz, Harrell, and Eddy suffer the same infirmity. All four declarants dispute, in some fashion or another, the challenged statements. However, none focus on George's attitude toward the truth of those statements, commenting instead on his integrity or lack thereof. In fact, in one instance, Gifford declares George confirmed that his source of information regarding a statement about Harrell was "a Siskiyou County Sheriff's deputy," a comment which tends to show George believed the statements he was making because those statements were the product of a conversation with someone George viewed as a reputable source.

Olson argues that "George <u>knew</u> at least some of the statements contained in [the Petition] were untrue, because he personally witnessed at least one of the events at issue." As support for that assertion, she cites nothing more than her own footnote contained in the opening brief, a footnote which refers generally to her declaration and the declarations of Harrell and Schultz. We reject contentions that are not supported by legal or factual analysis. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [reviewing court may disregard contentions not adequately briefed, e.g., claims perfunctorily asserted without development]; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)

21

Olson failed to make a threshold showing of a probability of prevailing on her claim.

IV

*Asserted Errors by the Trial Court*

Olson contends the trial court was laboring under a "fundamental unfamiliarity with SLAPP litigation" and thus failed to properly analyze the pleadings. The court's lengthy and detailed order granting the anti-SLAPP motion suggests otherwise, demonstrating a thoughtful, educated, and well-reasoned assessment of the facts and evidence presented in this matter. In any event, we review the trial court's ruling *de novo* and thus need not discuss further the manner in which the court reached its decision, only whether that decision was correct based on our independent assessment of the record. We conclude that it was.

V

*Limited Discovery Request*

Olson assigns error to the trial court's denial of all but one of the special interrogatories proposed in her request for limited discovery filed pursuant to section 425.16, subdivision (g). She contends the trial court's failure to grant her discovery request in full prejudiced her "by denying her access to the only known source of the information she needed to properly and fully rebut the baseless claims of George." As we will explain, there was no abuse of discretion.

In response to the anti-SLAPP motion, Olson filed a request for limited discovery seeking responses to 31 special interrogatories. Olson argued the proposed discovery was necessary to "help make my prima facie showing," and because she had "no other way to obtain the information sought." She argued further that the proposed interrogatories concerned "matters uniquely within the knowledge of [George]."

22

George opposed the discovery request, arguing it was impermissible and that Olson failed to show good cause in that she failed to demonstrate the proposed discovery was necessary to prove her *prima facie* case.

The trial court found as follows: "The prima facie case the Plaintiff is responsible for showing in the context of the issue that is before the Court today, does include an element of malice and that element of malice does specifically go to the defendant's state of mind." The court granted Olson's motion only as to Interrogatory No. 8, disallowing the remaining proposed interrogatories "for the reasons set forth in the filed opposition."

Section 425.16, subdivision (g) provides as follows: "All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision."

"We review for abuse of discretion the trial court's decision as to whether a plaintiff has complied with the requirements of section 425.16, subdivision (g) to merit discovery prior to a hearing on the motion to strike. [Citations.]" (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1247; see also *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 593.) " 'Under this standard the reviewing court will not disturb the trial court's decision unless it "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' (*Mendoza v. Club Car, Inc*. (2000) 81 Cal.App.4th 287, 301.)" (*Tuchscher Development Enterprises*, at p. 1247.)

"A request for discovery in opposition to an anti-SLAPP motion should be determined with reference to the issues raised in the motion. [Citation.]" (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 359.)

"Decisions that have considered what constitutes such a showing of good cause have described it as a showing 'that a defendant or witness possesses evidence needed by

23

plaintiff to establish a prima facie case.' [Citation.] The showing should include some explanation of 'what additional facts [plaintiff] expects to uncover . . . .' [Citations.] Only in these circumstances is the discretion under section 425.16, subdivision (g) to be 'liberally exercise[d].' [Citation.]" (*1-800 Contacts, Inc. v. Steinberg, supra*, 107 Cal.App.4th at p. 593.)

Olson does not explain what additional facts she expected to uncover. Conceding in her motion that many of the claims in George's declaration "could be easily proved or disproved as facts," and submitting her own declaration together with the declarations of Harrell and Schultz to do just that, Olson argued she was entitled to review "all of the facts attendant to" the statements in George's declaration without revealing what those facts might be.

Similarly, Olson argues on appeal that, "given the specific nature of the defamatory claims at issue, their vague nature, and complete lack of alleged dates, times, places, specific acts, and involved individuals, Olson was in no position to obtain any specific information relating to the claims made against her other than from George." Again, we are left to wonder what facts other than those rebutted by her supporting declarations she expected to expose.

Further, the requested discovery is comprised almost entirely of interrogatories which seek to challenge George's declaration. For instance, 25 of the 31 interrogatories identify a particular paragraph of George's declaration and request information to substantiate statements contained in that paragraph. "Discovery may not be obtained merely to 'test' the opponent's declarations. [Citation.]" (*1-800 Contacts, Inc. v. Steinberg, supra*, 107 Cal.App.4th at p. 593.)

In any event, the trial court, recognizing Olson's *prima facie* showing would likely include an element of malice, granted Olson's request as to Interrogatory No. 8, which states: "In reference to #12 of your declaration, state all facts upon which you relied for your belief that the statements contained in the [Petition] were true and accurate. In

24

answering this interrogatory, if a fact is identifiable in reference to a particular occurrence, place, time, and/or individual, give the specific identifying information relating to the occurrence, place, time, and/or individual." Given the parties' concession that the allegations in the Complaint refer to the written statements in the Petition and George's verbal statement to Gifford, Interrogatory No. 8 suffices for purposes of discovering information to allow Olson to make a *prima facie* showing of malice.

On this record, we find no abuse of discretion in the trial court's decision to disallow 30 of the 31 special interrogatories requested by Olson.

VI

*Denial of Leave to Amend*

Olson contends the trial court "evade[d] its responsibility to fully evaluate all of the relevant facts" when it denied her request to amend the Complaint, both before and after the filing of the anti-SLAPP motion. We disagree. The record makes clear that, in spite of the deficiencies in the Complaint, the trial court carefully considered the Petition, the statements by George to Gifford, and all other evidence presented at the hearing on the anti-SLAPP motion. We took that evidence into account as well in our *de novo* review here on appeal. The Complaint was treated as if it had in fact been amended to include that evidence, and we therefore reject Olson's claim.

DISPOSITION

The judgment is affirmed.  Defendant George shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

     HULL     , Acting P.  J.

We concur:

     BUTZ     , J.

     DUARTE     , J.